UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ROSE FORD,                                      )
                                                )
                    Plaintiff,                  )
                                                )
            v.                                  )    CASE NO. 1:05-cv-0854-DFH-TAB
                                                )
JO ANNE B. BARNHART, Commissioner               )
of the Social Security Administration,          )
                                                )
                    Defendant.                  )

ENTRY ON JUDICIAL REVIEW

Plaintiff Rose Ford has filed a *pro se* request for judicial review of a decision by the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income under the Social Security Act.   Acting for the Commissioner, Administrative Law Judge ("ALJ") Paul Armstrong found that Ms. Ford was not disabled within the meaning of the Act because she was capable of performing a significant range of light work, including her past relevant work as a janitor.  Ms. Ford has filed a letter with the court describing her symptoms and impairments, and she seeks review of the ALJ's findings.  As explained below, the ALJ's findings are supported by substantial evidence in the record.  The denial of benefits must be upheld.

*Background*

Rose Ford was 50 years old when the ALJ found her ineligible for benefits under the Social Security Act on January 30, 2004.  Ms. Ford had an education

through part of the 11th grade and previous work experience as a back up cook, a food preparer, a housekeeper, and a janitor.  She alleged that she had become disabled on April 26, 2000 because of back and foot pain, depression, left arm and groin pain, bilateral foot and ankle pain, headaches, anemia, and complications after oral surgery.

Ms. Ford reported that she was injured in a fall while working at Red Lobster in 1998 and that she suffered from back, leg, and head pain that rendered her unable to work in 2000.  She claimed to have worked at Denison Parking as a janitor following her termination from Red Lobster, and claims that she was terminated by Denison because she took too many sick days.  She reported that she had not worked since July 2001.  R. 170-71.

A 1999 functional capacity evaluation by Lisa Beals, MS OTR, of Nova Care Outpatient Rehabilitation stated that Ms. Ford "demonstrated significant improvements" in her pace and quality of movement.  Beals stated that Ms. Ford experienced discomfort in the left cervical region with some lifting and carrying, that use of a TENS unit reduced her pain, that she tended to "drag her feet" when walking, and that her left leg and right grip strength was slightly diminished.  The evaluation stated that Ms. Ford could lift up to 25 pounds and had no significant deficits in her sitting, standing, or walking tolerance.  Ms. Beals opined that Ms. Ford could not lift items of 50 pounds but could "likely tolerate" prolonged standing, carrying food items, and food preparation.  R. 401-04.

A radiology consultation report completed by Dr. J. Shannon Swan from June 2000 showed no abnormalities in Ms. Ford's lumbar spine, cervical spine, and normal results of examination of her left shoulder and both knees.  R. 442-45.

On June 15, 2000, L. Daniel Wurtz, M.D., professor of orthopaedic surgery at Indiana University, wrote to Ms. Ford's physician Gregory Kiray, M.D., that he had seen Ms. Ford regarding the pain in her back and neck after her fall.  Dr. Wurtz noted that Ms. Ford had "tenderness at the spinous process of C6 to C7 region," a full range of neck motion, normal strength in her arms and legs, a negative straight leg raise sign, normal sensation in her arms and legs, intact deep tendon reflexes, and "mild tenderness palpable at the thoracal lumbar junction of the midline of her back."  R. 384.  Dr. Wurtz noted no abnormality of Ms. Ford's lumbar spine or "C-spine" and recommended referral to a pain management program, as he could find no problems that would be aided by surgery.  *Id.*

In November 2000, Valyn Saylor, ACSW, LCSW, of Family Service Association of Central Indiana completed a mental health summary after an evaluation of Ms. Ford.  The summary states that Ms. Ford's profile score was in the highest category for depressed mood, that it gave a high recommendation for antidepressant medication, a severe confirmation of a depressive episode, and confirmed melancholia.  A Burns Anxiety Inventory of Ms. Ford placed her in a category denoting extreme anxiety or panic, and Ms. Ford's Burns Suicidal Urges Scale score placed her at high risk.  R. 251.

An April 2001 x-ray of Ms. Ford's hip was negative.  R. 382.  An October 2001 MRI report noted an impression of cervical spondylosis, worst at the C5-6 level with mild left neural foraminal narrowing at several levels.  R. 375.  Ms. Ford sought treatment for pain related to a "hip mass" in December 2001.  R. 312.

Ms. Ford sought pain management treatment from Dr. Palmer Mackie in April 2002.  Dr. Mackie diagnosed Ms. Ford with Major Depressive Disorder, Anxiety Disorder NOS, chronic pain, and evaluated Ms. Ford's GAF at 75.  R. 296.

In April 2002, Ray Henderson, M.D., examined Ms. Ford after she was referred for evaluation of her back and leg pain.  Dr. Henderson assessed Ms. Ford as having low back pain secondary to arthritis, chronic depression, and chronic pain syndrome aggravated by psychological factors.  R. 433-37.

R. Fife, M.D., completed a "Physical Residual Functional Capacity Assessment" of Ms. Ford.  Dr. Fife opined that Ms. Ford could lift up to 20 pounds occasionally, could lift up to 10 pounds frequently, could stand, sit, and/or walk for about 6 hours in an 8-hour workday, could perform unlimited pushing or pulling, could occasionally climb, balance, stoop, kneel, crouch, and crawl, and that Ms. Ford should avoid concentrated exposure to vibration.  R. 424-31.

Treatment notes show that Ms. Ford received treatment at Midtown Community Mental Health Center ("the Mental Health Center") from April 2000

through at least July 2003.  R. 32, 63, 93, 192-225.  Treatment notes show Ms. Ford regularly reported experiencing depression, anxiety, and physical pain.  R. 35, 51, 59, 63, 76, 85.  Intake notes from May 2002 show that Ms. Ford had been prescribed an increased dosage of Paxil and was experiencing increased mood, appetite, and interest, but that she was "easily tearful and bitter."  R. 90.

Consulting examiner Thomas H. Smith, Ph.D., HSPP, performed a mental status examination of Ms. Ford in May 2002.  Dr. Smith noted Axis I diagnoses of Major Depressive Disorder (recurrent with severe psychotic features) and Generalized Anxiety Disorder, noted self-reported pain at Axis III, and evaluated Ms. Ford's current GAF at 48, and her highest GAF in the past year at 55.[1]  R. 284.

Consulting reviewer D. Unversaw, Ph.D., completed a psychiatric review technique form assessing Ms. Ford.  Despite noting Dr. Smith's relatively low GAF scores, Dr. Unversaw reported that Ms. Ford had non-severe mental impairments of affective disorders and anxiety-related disorders with coexisting nonmental impairments.  R. 262, 274.  Dr. Unversaw evaluated Ms. Ford as having mild

---

[1]GAF stands for Global Assessment of Functioning.  It is a mental health rating that estimates a person's psychological, social, and occupational capacities. American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. Text Revision 2000).  A GAF of 48 denotes serious symptoms or any serious impairment in social, occupational, or school functioning.  A GAF of 55 denotes moderate symptoms or moderate impairment.  *Id.* at 34.

limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  R. 272.

Ms. Ford attended physical therapy at Wishard Health Services during 2002.  R. 188, 211, 216.  She reported experiencing pain, but treatment notes state that she gave inconsistent reports as to the subjective description and rating level of her pain.  R. 97.  Ms. Ford was discharged due to a plateau in her status and the achievement of therapy goals.  R. 211.

Ms. Ford attended a job preparation session in July 2002.  She reported that she was not yet ready to obtain employment, but wanted to learn appropriate social interaction skills.  Ms. Ford was characterized as having a pleasant mood, logical thoughts, and as having interacted well with her peers.  R. 82.

In September 2002, Dr. Kiray ordered a CT scan of Ms. Ford's pelvis relating to her complaints of groin pain.  The results of the scan showed "[n]o explanation for the pain in the groin or other abnormality."  R. 118.

Ms. Ford completed a daily activity questionnaire in November 2002 stating that she had trouble sleeping and concentrating due to pain.  She wrote that she prepared simple meals for herself, did laundry, vacuumed, mopped floors, and cleaned the bathroom once a week, took out the trash twice per week, and that she washed dishes as well.  She wrote that her son helped her with these chores.

R. 124-30.  Ms. Ford also completed a pain questionnaire.  She wrote that he experienced pain in her head, neck, shoulder, back, and feet that felt like "thousands of needles are sticking me all at once."  R. 121.  She wrote that the medication eased her pain but did not stop it, and that she was then being prescribed methadone, Zantac, Atarax, and Prozac.  R. 121-23.

Ms. Ford sought treatment from Dr. Kiray regarding her back, leg, and foot pain in December 2002.  Dr. Kiray's notes also indicate Ms. Ford was experiencing depression with no suicidal ideation.  R. 111.

Ms. Ford sought treatment for foot pain with Dr. Alan Bier in 2002 and 2003.  Dr. Bier's notes indicate a diagnosis of plantar fibromatosis.  R. 60.  Ms. Ford reported the pain was at a 5 on a scale of 1 to 10.  Dr. Bier recommended that Ms. Ford use orthotics, rest, take naproxen, and wear socks.  R. 75.  He later noted that Ms. Ford's foot pain was not resolved by non-steroidal anti-inflammatory drugs, but that she received some relief with orthotics.  R. 60.

In June 2003, Ms. Ford complained of depression due to physical problems, financial stresses, and her mother's death.  She reported having recently considered suicide, and agreed to take Prozac.  R. 45.  Treatment notes from July 2003 state that Ms. Ford had normal affect, mood, thought processes, and thought content.  R. 32.

In July 2003, Dr. Kiray referred Ms. Ford for an electromyogram ("EMG") study after months of reports by Ms. Ford of a burning pain in her feet. The study of Ms. Ford's left leg yielded normal results. R. 39-41.

The ALJ held a hearing on September 30, 2003, which was attended by Ms. Ford, her attorney, a medical expert, and a vocational expert. R. 447. Ms. Ford testified she was unable to work as a result of her chronic pain, other physical symptoms, and depression.

Medical expert Jack Thomas, Ph.D., testified that Ms. Ford had "reactive depression" secondary to physical impairments and bereavement. He opined that, apart from two periods in which Ms. Ford appeared to have low GAF ratings (48 in May 2002 and 31 in October 2000), her depression was mild. R. 478. He testified that Ms. Ford had shown signs of suicidal ideation and that she was prone to somatization.[2] He testified that Ms. Ford's mental impairment did not meet a listing; she had moderate limitations in social functioning, concentration, persistence, and pace, but had not experienced an episode of decompensation. He also opined that Ms. Ford should be restricted to performing simple repetitive tasks, should have only superficial contact with others, and should avoid "fast-paced or assembly line work." R. 482-83.

---

[2]Somatization is "the process by which psychological needs are expressed in physical symptoms," such as the "expression or conversion into physical symptoms anxiety, or a wish for material gain associated with a legal action following an injury, or a related psychological need." *Stedman's Medical Dictionary* 1634 (26th ed. 1995).

The vocational expert testified that a hypothetical individual restricted to light exertional duties, limited to simple repetitive tasks with only superficial contact with others who was totally restricted from fast paced or assembly line work would be able to return to Ms. Ford's previous work as a janitor at the unskilled light level.[3]  The vocational expert opined that such an individual could also perform other janitorial jobs and food preparation jobs.  She opined that such an individual would not be able to perform any of Ms. Ford's past relevant work if she was limited to sedentary exertional duties due to pain.[4]  The vocational expert testified that the same individual, restricted to sedentary work, could likely perform the tasks of a cashier, which required frequent but superficial contact with others.  R. 486-87.

After Ms. Ford's claim for disability benefits was denied both initially and on reconsideration, she requested a hearing before an ALJ.  In November 2003, Ms. Ford filed an application for supplemental security income, the consideration of which was accelerated to the hearing level because of the identity of issues with her disability benefits application.  After a hearing, the ALJ issued his decision finding that Ms. Ford was not disabled on January 30, 2004.  Because the

_____

[3]Light work involves lifting no more than 20 pounds at once, with frequent lifting or carrying objects weighing up to 10 pounds.  Jobs in this category require either "a good deal of" walking or standing, or sitting most of the time with some pushing or pulling of leg or arm controls.  20 C.F.R. § 404.1567(b).

[4]Sedentary work involves lifting no more than 10 pounds at once and frequent lifting or carrying small items.  Jobs in this category commonly involve sitting, but "a certain amount of walking or standing is often necessary in carrying out" sedentary job duties.  20 C.F.R. § 404.1567(a).

Appeals Council denied further review of the ALJ's decision, the decision is treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  Ms. Ford filed a *pro se* complaint seeking review of the disability determination.  The court has jurisdiction in the matter under 42 U.S.C. § 405(g).

### The Disability Standard

To be eligible for disability insurance benefits, a claimant must establish that she suffers from a disability within the meaning of the Social Security Act. To prove disability under the Act, the claimant must show that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  Ms. Ford was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her.  42 U.S.C. §§ 423(d), 1382c(a)(3).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including

taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability.  The steps are:

(1)  Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)  If not, did the claimant have an impairment or combination of impairments that are severe?  If not, she was not disabled.

(3)  If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)  If not, could the claimant do her past relevant work?  If so, she was not disabled.

(5)  If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. §§ 404.1520, 416.920.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

*Standard of Review*

If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing

*Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  Accordingly, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review."  *Briscoe*, 425 F.3d at 351.

## Discussion

Applying the five-step evaluation process, the ALJ found that Ms. Ford satisfied steps one and two:  she was not currently working and she had the severe impairments of degenerative disc disease and depression.[5]  He found that

---

[5]Although Ms. Ford was employed after her alleged onset date, the ALJ
(continued...)

her other alleged impairments, including left arm and groin pain, bilateral foot and ankle pain, headaches, anemia, and symptoms from oral surgery were not severe impairments within the meaning of the Social Security Act.  The ALJ found that Ms. Ford did not satisfy steps three or four.  At step three, she failed to show that her impairments met or equaled a listed impairment.  At step four, the ALJ found that Ms. Ford retained the residual functional capacity to perform her past occupation as a janitor.  The ALJ therefore found that Ms. Ford was not disabled under the Act without reaching step five.  Ms. Ford challenges the ALJ's finding that she was not disabled within the meaning of the act.  She has done so by submitting a letter detailing her symptoms, daily limitations, and medication.

I.      *Ms. Ford's Residual Functional Capacity*

The ALJ found that Ms. Ford retained the residual functional capacity to engage in light work activity limited to simple repetitive tasks and only superficial contact with others, with no fast paced or assembly line work.  R. 19, 20.  The ALJ's residual functional capacity finding is supported by substantial evidence.

In finding Ms. Ford capable of performing the demands of light work, the ALJ relied on the findings of Dr. Ray Henderson.  In April 2002, Dr. Henderson examined Ms. Ford after she was referred for evaluation of her back and leg pain.

---

[5](...continued)
found that this later employment did not amount to substantial gainful activity because she did not earn a sufficient amount.  R. 16.

Dr. Henderson rated Ms. Ford as having a largely normal range of motion in her spine, arms, and legs.  He noted that Ms. Ford had normal muscle development and strength, normal grip strength, that she could perform fine finger manipulation, and that she could also perform tandem walking, balance on one foot, and maneuver onto the exam table without trouble.  Dr. Henderson assessed Ms. Ford as having low back pain secondary to arthritis, chronic depression, and chronic pain syndrome aggravated by psychological factors.  R. 433-37.

The ALJ noted that Dr. Henderson found largely normal results upon his examination and system review of Ms. Ford.  Specifically, the ALJ cited Dr. Henderson's finding that, Ms. Ford was "able to perform all the usual activities of daily living."  R. 18, 19, 436.  The ALJ also cited Dr. Fife's physical residual functional capacity assessment indicating that Ms. Ford was capable of performing light work.  R. 17, citing R. 424-31.

Additionally, although the record includes evidence that Ms. Ford repeatedly reported experiencing pain, the objective medical evidence repeatedly showed normal or near normal results.  For example, a June 2000 radiology report showed no abnormalities in Ms. Ford's lumbar spine, cervical spine, left shoulder and both knees.  R. 442-45.  Although Dr. Wurtz, professor of orthopaedic surgery, noted "tenderness at the spinous process of C6 to C7 region," he noted that Ms. Ford had a full range of neck motion, normal strength in her arms and legs, a negative straight leg raise sign, normal sensation in her arms and legs,

intact deep tendon reflexes, no obvious abnormality in her lumbar or cervical spine and only "mild tenderness palpable at the thoracal lumbar junction of the midline of her back." R. 384.  A 2002 CT scan showed no explanation for Ms. Ford's groin pain, R. 118, and a 2003 EMG ordered by Dr. Kiray relating to Ms. Ford's foot pain showed normal left leg results.  R. 39-41.  Additionally, the ALJ's finding that Ms. Ford could perform light work was consistent with her 1999 physical therapy assessment following her fall while working at Red Lobster.  See R. 402-04.

Although the ALJ did not mention Dr. Bier's diagnosis of Ms. Ford with plantar fibromatosis in 2002, see R. 60, 75, the ALJ is not required to provide an in-depth analysis of every piece of evidence the claimant provides.  *Diaz*, 55 F.3d at 308; *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988).  The question is whether the trier of fact builds an adequate and logical bridge between the evidence and the result.  *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).  "An ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required."  *Diaz*, 55 F.3d at 307, citing *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  Although the ALJ failed to discuss this specific diagnosis, the ALJ considered Ms. Ford's complaints of foot pain and noted that, as with her other non-severe impairments, there was no medical evidence in the record that Ms. Ford experienced greater limitations as a result of the pain.  R. 18.  The court can find no evidence in the record indicating that Ms. Ford experienced greater impairment as a result of her plantar fibromatosis, and Dr. Bier's notes indicate

that Ms. Ford received some relief by using orthotics. R. 60. Accordingly, the ALJ's omission, even if error, does not warrant remand. See, *e.g.*, *Rice v. Barnhart*, 384 F.3d 363, 370-71 (7th Cir. 2004) (affirming ALJ's residual functional capacity finding where it was consistent with two medical opinions in the record and where the record contained no medical opinions indicating greater limitations than those found by the ALJ).

The ALJ's finding regarding the limitations on Ms. Ford's residual functional capacity as a result of her mental impairments is also supported by substantial evidence. The ALJ noted and evaluated Dr. Smith's 2002 assessment report stating that Ms. Ford experienced serious impairment, demonstrated by her GAF rating of 48. The ALJ partially discounted Dr. Smith's assessment and gave greater probative weight to Dr. Thomas's testimony and Dr. Unversaw's assessment that Ms. Ford's mental impairments were non-severe. R. 19. Additionally, the ALJ limited his assessment of Ms. Ford's residual functional capacity, finding that she should be limited to simple repetitive work and restricted from fast-paced work or work that required more than superficial contact with others, based on Dr. Thomas' recommendations. R. 20.

Although examining sources are generally accorded greater weight than non-examining sources, in determining the weight of a medical source opinion, the ALJ considers a number of factors, including: (a) the length, nature, and extent of any treating relationship between the claimant and the source; (b) the

source's consistency with the record as a whole; (c) the source's supportability; (c) the specialization of the source; and (d) any other relevant factor.  20 C.F.R. §§ 404.1527(d) & (f), 416.927(d) & (f).

The ALJ explained that he was giving greater probative weight to the evaluations of Dr. Thomas and Dr. Unversaw.  The ALJ noted that Dr. Thomas and Dr. Unversaw had the benefit of reviewing the entire record.  R. 19.  In light of the consistency between Dr. Thomas's and Dr. Unversaw's opinions, and the additional evidence available to each, the ALJ's decision to assign less probative weight to Dr. Smith's assessment was permissible.  It is not the task of the reviewing court to substitute its judgment for the ALJ's judgment by reweighing the evidence.  *Cannon*, 213 F.3d at 974.  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's determination.  *Binion*, 108 F.3d at 782.

The ALJ's residual functional capacity finding was based on substantial evidence in the record and was in accordance with the law.  Accordingly, this finding will not be disturbed.

II.    *Ms. Ford's Capacity to Perform her Past Work as a Janitor*

At step four the ALJ found that Ms. Ford was able to perform her past relevant work as a janitor.  This finding was based on the testimony of vocational expert Stephanie Archer that a hypothetical individual with Ms. Ford's limitations

as found by the ALJ (simple repetitive light work with no fast-paced or assembly line work and only superficial contact with others) could perform Ms. Ford's past work as a janitor.   Ms. Archer gave her testimony after hearing Ms. Ford's testimony as to the demands of her job as a janitor.   It was entirely proper for the ALJ to rely on Ms. Archer's opinion, see 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2), and Ms. Ford has shown no evidence that Ms. Archer's opinion was somehow flawed.   Accordingly, the ALJ's step four finding is supported by substantial evidence.

III.   *Ms. Ford's Credibility*

In finding Ms. Ford was not disabled within the meaning of the Act, the ALJ partially discounted Ms. Ford's testimony as to the functional limitations imposed by her physical and mental impairments.  R. 20.

Ms. Ford testified at the hearing that she could not lift 20 pounds, could not engage in her past work as a janitor, and was generally totally disabled by her impairments.   She testified that she received treatment for her mental impairments from a psychiatrist who prescribed medications for her, and a counselor whom she visited weekly.  When asked if she had attended vocational rehabilitation meetings, Ms. Ford testified that she "went to one meeting, and the pain was just too bad."  R. 455.  Ms. Ford further testified as follows:

Q.     Okay.  Let me – now, back in July 15 of '02 you told the vocational people that you weren't ready to obtain employment at this time.  Do you remember that?

A.     Yes.

Q.     How about now?  Are you ready now?

A.     Yeah, if there's something I can do.

Q.     Okay.  What do you think you can do?

A.     Nothing but kill myself.

R. 457.

Ms. Ford testified that she suffered from "suicidal headaches" that prevented her from "deal[ing] with other people." R. 457-58.  She testified that she felt as though she had "thousands of needles shooting" in her neck, pain in her head that felt as though she was being strangled, and a pinching feeling in the back of her head.  R. 458.  She testified that the Vicodin she was prescribed to treat the headaches was "not working."  R. 462-63.

Ms. Ford also testified that she had broken arches and arthritis that caused a burning sensation and pain in her feet.  R. 463.  She testified that she had use of her hands, with the exception of one finger on her left hand, that she could not walk more than two blocks or climb several flights of stairs without taking a break because of leg pain, and that she had pain in her hip.  R. 466, 477.  She testified that she spent most of her day resting, and that she had not received any

treatment, aside from methadone, that relieved her pain to the extent that she was capable of work.

She testified that she could not return to her previous work because of her headaches, R. 462, 469, pain in her back and legs, and because she stayed "tired all the time." R. 464. She testified that she did not cook, clean, or drive, but that she could use public transportation. R. 467. Ms. Ford testified she could lift something only as heavy as a small bottle of bleach and could not lift a 20-pound sack of potatoes. R. 474-75.

The ALJ evaluated Ms. Ford's credibility as a witness to be "only fair" and determined that Ms. Ford's reports provided no justification for reducing her residual functional capacity below the assessments of the agency consultants and reviewers. R. 19. A reviewing court ordinarily defers to an ALJ's credibility determination. The general rule is that absent legal error, an ALJ's credibility finding will not be disturbed unless "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Diaz*, 55 F.3d at 308.

The ALJ provided several reasons for discounting Ms. Ford's testimony about the severity of her impairments. In explaining his credibility determination, the ALJ noted Ms. Ford "complained of headaches" but "admitted that these are relieved with medication, particularly Methadone." R. 19. Ms. Ford testified that the only medication that helped her was methadone, but the record also includes

some indication that her methadone may have caused weight gain, which exacerbated her back problems. See R. 458, 462, 476-77. Ms. Ford testified that her doctors had taken her off some of her medication because "they wanted [her] to go back on methadone," though she explained that she did not want to take the methadone. R. 455. In light of the possible side effect of her methadone and her testimony that she was not currently taking the drug, the ALJ's citation to this evidence does not offer clear support for his adverse credibility finding.

The ALJ also noted that although Ms. Ford received a vocational rehabilitation referral, she attended only one meeting and stated that she was not yet ready to return to work, but then testified before the ALJ that she was ready to return to work if there was something she could do. Ms. Ford further testified that the only thing she felt she could do was kill herself. While the ALJ is entitled to discount evidence that is internally inconsistent or inconsistent with other evidence in the record, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), the extent to which these statements reflect an inconsistency is unclear to the court.

Central to the ALJ's credibility determination, however, was his finding that no clinically substantiated medical documentation supported the assertion that Ms. Ford's highly limited daily activities were due to her impairments. The record shows that results of Ms. Ford's physical examinations showed largely normal results, including Dr. Henderson's finding that Ms. Ford could perform all of the usual activities of daily life. Also, relying on the testimony of Dr. Thomas, the ALJ

found Ms. Ford's depression was mild, apart from isolated episodes.  While the ALJ may not disregard a claimant's subjective complaints merely because they are not fully supported by objective medical evidence, the ALJ must nonetheless consider such a lack of medical evidence in rendering his credibility determination.  20 C.F.R. 404.1529(c)(2) (objective medical evidence is a "useful indicator" of the intensity of a claimant's symptoms and the extent to which a claimant's ability to work is impaired); SSR 96-7p.

The ALJ also indicated that his credibility determination was based in part on his opportunity to observe Ms. Ford's demeanor while testifying.  R. 19.  The ALJ's unique opportunity to see and hear the claimant while testifying as to her impairments and limitations is the foundation for the courts' deferential review of ALJ credibility determinations.  *Shramek*, 226 F.3d at 811.  As with a lack of medical evidence in the record, an ALJ is not free to accept or reject a claimant's allegations based *solely* on personal observations of demeanor.  These observations, however, should nonetheless be considered in the overall credibility evaluation.  SSR 96-7p.

The ALJ did not completely discredit Ms. Ford, but held only that her testimony was not credible to the extent that it was not supported by the medical evidence in the record.  R. 19.  Accordingly, the court cannot say that the ALJ's credibility finding, in light of his direct observation of Ms. Ford and his analysis of the medical evidence, is patently wrong.

*Conclusion*

The court recognizes that Ms. Ford claims to experience severe pain and symptoms of her mental impairments.  The task of this court, however, is to determine whether the ALJ's decision is within the law and supported by substantial evidence in the record.  *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).  It was both, and it must be upheld.  Judgment shall be entered accordingly.


So ordered.

Date:  June 21, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Rose Ford
1311 North New Jersey - C
Indianapolis, IN 46202

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov